**The relief described hereinbelow is SO ORDERED.**

**SIGNED this 6th day of September, 2012.**



_____
Robert D. Berger
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

**In re:**

**AARON GRANT BUERGE,**      Case No. 11-20325
    **Debtor.**      Chapter 7

**MEMORANDUM OPINION AND ORDER
GRANTING MOTION TO ABANDON AND DENYING MOTION TO SELL**

Debtor seeks to compel the Chapter 7 Trustee to abandon Debtor's minority stock interest in two closely held bank holding companies. The Trustee seeks an order approving the sale of the stock to Debtor's most significant creditor, Prime Lending II, LLC.[1] The Trustee failed to prove the bidders qualified as good faith purchasers or offered to purchase the stock for value. Instead, Debtor proved the sale is too costly and the return to unsecured creditors is too inconsequential to overcome the burden the sale would impose. Accordingly, the Trustee's motion is denied, and Debtor's motion is granted.

---

[1] Prime could not qualify as a bidder under the stock purchase agreements restricting the stock's transfer, so the bidders became Prime's individual members, David Johnson, Monte McDowell, Jose Evans, Melvin Dunsworth, Steven Chase, Bradley Nicholson, and Kevan Acord, collectively referred to as Prime in this opinion.

12.09.06 Buerge Sale or Abandon.wpd

## Background

Prime and Debtor have been litigating since December 16, 2008. Debtor's former lender, Columbian Bank and Trust Company, failed that year, and the FDIC liquidated Columbian's loan portfolio. Debtor, a banker, made a bid for the loans Columbian made to his restaurant businesses, Trolley's, LLC; Trolley's Overland Park, LLC; and Trolley's Real Estate Holdings, LLC (collectively referred to herein as "Trolley's"). Debtor guaranteed the loans, which totaled approximately $3.7 million and were secured by Trolley's real estate and assets. The FDIC sold the loans to Prime's predecessor, which immediately assigned the loans to Prime. Upon obtaining the notes out of the disarray of Columbian's failure, Prime declared the loans in default and filed suit in state court on February 6, 2009, against Debtor, Trolley's, and partners. Trolley's filed for bankruptcy on May 11, 2009. The Trolley's bankruptcies, which were also before this Court, were extremely litigious with Prime. The bankruptcy concluded with the liquidation of Trolley's assets. Debtor filed for Chapter 7 relief on February 11, 2011. On December 4, 2011, Prime filed a proof claim for $4,707,937.90. On March 23, 2012, Prime amended its proof of claim to $2,545,668.66 to reflect Prime's recovery from liquidation of Trolley's assets.

## Findings of Fact

On the Debtor's bankruptcy petition date, Debtor owned stock consisting of 326 shares (or approximately 11 percent) of a family-owned bank holding company known as Buerge Bancshares, Inc. (BBI), and 132.64225 shares (or approximately 11 percent) of another family-owned bank holding company known as Financial Enterprises, Inc. (FEI). BBI's subsidiary bank is First State Bank of Joplin, Missouri, and FEI's subsidiary bank is First National Bank of Clinton, Missouri, both small community banks. BBI and FEI are primarily owned by Debtor's

- 2 -
12.09.06 Buerge Sale or Abandon.wpd
Case 11-20325 Doc# 204 Filed 09/06/12 Page 2 of 16

father, Alden Buerge, Debtor's brother, and Debtor. Approximately ten percent of each company is held by non-family shareholders. The Buerge family has been in the banking business since 1965.

Debtor is a party to stock purchase agreements (SPAs) with BBI and FEI , which restrict Debtor's ability to transfer the stock and impose certain requirements upon disposition. The most significant restriction prohibits a transfer which destroys BBI's and FEI's eligibility for Subchapter S tax treatment.

Debtor maintains he has no equity in the stock. Debtor's schedules value the BBI shares at $1,102,930.30, and the FEI shares at $566,255.07. FEI is a C corporation and does not pay dividends. BBI is a Subchapter S corporation and pays quarterly distributions to cover the income tax associated with profit passed through to the shareholders. The stock is encumbered by liens held by Liberty Bank and Alden Buerge. The liens secure approximately $1,798,000 in debt. Quarterly debt service payments on the loans secured by the stock total about $27,249, and the estimated quarterly state and federal taxes are about $34,385. The dividends usually do not provide shareholders with cash in excess of their tax liability. There was one exception regarding a larger than usual distribution made in the fourth quarter of 2011. The evidence proved this one unusually high dividend was an anomaly triggered by the disruption to BBI's normal business following the devastating May 22, 2011, Joplin tornado.[2] Thus, the stock does not have any value to the estate beyond what the shares are worth. In fact, the shares generate income tax liability to the bankruptcy estate. BBI has historically generated a profit. As a pass-

---

[2] Alden Buerge testified he miscalculated the dividend because he was distracted by a recent cancer diagnosis and the effects of the Joplin tornado. Many Joplin borrowers were paying off their loans with insurance proceeds. BBI invested the influx of these loan payoffs in tax-free municipal bonds. This change actually created less tax liability for shareholders than Mr. Buerge anticipated. Mr. Buerge determines the dividends, and they are usually just enough to cover the shareholders' Subchapter S corporation pass-through tax liability.

- 3 -
12.09.06 Buerge Sale or Abandon.wpd
Case 11-20325   Doc# 204   Filed 09/06/12   Page 3 of 16

through taxable entity, the profits are taxed at the shareholder level. The bankruptcy estate is burdened with the proportionate income tax liability attributed to BBI's profits. If BBI does not distribute dividends to cover these tax liabilities, the bankruptcy estate does not have assets to pay the tax liability. The longer the Chapter 7 Trustee holds the BBI stock, the greater the income tax liability associated with BBI profits.

Prime offers to purchase all the stock for a base bid of $1,830,000. The bid will increase daily from the petition date to cover the interest accruing *per diem* on the secured claims. The bid also includes a $50,000 escrow deposit to apply toward the secured creditors' attorney fees. Unsecured claims filed against the estate are approximately $3 million. Prime's unsecured claim constitutes 85 percent of this class. After deducting the $1,798,968.55 in secured claims and the sale costs including the anticipated $80,463 trustee fee, approximately $27,685 would be available to distribute to unsecured creditors – about a 0.9 percent return.

**Procedural History**

Debtor has appeared as a witness before this Court several times through the course of this case and the Trolley's bankruptcies. He is a credible and forthcoming witness. The Trustee testified Debtor has been cooperative throughout the process. Even though the Trustee continued the meeting of creditors nine times, the Trustee testified he had no difficulties obtaining information from Debtor. Prime requested and received at least three extensions of time to file a complaint objecting to dischargeability, but never filed a complaint. Prime conducted extensive discovery. Debtor received his discharge on October 5, 2011.

On September 8, 2011, the Trustee moved to abandon the stock because the SPA transfer restrictions, the amount of the secured debt, the attendant sale costs, and a lack of marketability made the stock of inconsequential value to the estate. Also, the Trustee had not received any

- 4 -

offers for the stock even though Prime had been investigating the stock's value for several months.  Prime objected, and on November 3, the Trustee withdrew his motion to abandon.  Debtor filed his own motion to abandon on December 6, and on December 8, the Trustee filed his motion to sell the stock to Prime.  Prime and the Trustee objected to Debtor's motion to abandon.  Debtor, Alden Buerge, BBI, and FEI objected to the Trustee's sale motion.[3]  There are five other creditors who have filed proofs of claims in this case, but none of them support or oppose either motion.

The motions were originally set for a February 28, 2012, trial date, but on February 27, the Trustee filed an Amended Asset Purchase Agreement substituting the Prime individual members as the bidders in place of the limited liability company.  The Trustee testified this was done because consummation of the original APA would destroy BBI's and FEI's eligibility for Subchapter S corporation tax status and could not be a valid purchase under the SPAs and nonbankruptcy law.  The Trustee filed another Amended and Restated Asset Purchase Agreement and Amended Auction and Bid Procedures on March 20, which amendments also attempted to address problems with the proposed sale.  The problems again involved satisfying the SPA transfer restrictions, paying the secured debt which was growing *per diem*, the attendant sale costs which were rising, and the inability to market the stock because of fears of violating Securities and Exchange Commission laws.  After much briefing, the matters came to trial on July 11, 2012.  Not one Prime member appeared in person, but their counsel took the lead in presenting the evidence in support of the Trustee's sale motion and in opposition to Debtor's motion.

---

[3] Liberty Bank objected but resolved its objection prior to trial.

## Conclusions of Law

### A.    Motion to Sell

The Chapter 7 trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.[4] The trustee bears the burden to prove a sound business reason; a fair sale price; adequate and reasonable notice; and the buyer is a good faith purchaser.[5] The trustee's duty is to maximize the value obtained from a sale, but he must also avoid undue risk. The Chapter 7 trustee's primary role is to liquidate property for the benefit of unsecured creditors.[6] Attempting to sell secured property is risky if the trustee does not anticipate sales proceeds will produce some equity for the benefit of the estate.  If the sales proceeds are insufficient to pay the costs of sale, the trustee may not be able to recover them under §506(c) from a secured creditor who did not consent to the sale.[7] The trustee is granted wide discretion in the conduct of the sale, and the court is granted wide latitude in deciding whether to grant or deny approval.[8]  The court may interfere with the trustee's judgment to safeguard the diverse interests of the debtor, creditors, bidders, and equity holders.[9]  Sales are not to be directed by the "hue and cry of the most vocal special interest groups."[10]  The court may

---

[4]  11 U.S.C. § 363(b)(1); FED. R. BANKR. P. 6004(f)(1).
[5]  *In re Bakalis,* 220 B.R. 525, 531-32 (Bankr. E.D.N.Y. 1998); *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008).
[6]  *Rambo v. Chase Manhattan Mortg. Corp. (In re Rambo)*, 297 B.R. 418, 434 (Bankr. E.D. Pa. 2003).
[7]  *Id.* Attempting to sell estate property after it is apparent no equity exists for the estate is "unnecessary" under § 506(c).
[8]  *In re Bakalis,* 220 B.R. at 531-32.
[9]  *Id.* at 532.
[10]  *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).

- 6 -
12.09.06 Buerge Sale or Abandon.wpd

Case 11-20325    Doc# 204    Filed 09/06/12    Page 6 of 16

consider many salient factors. Some relevant factors for this case include the proportionate value of the asset to the estate as a whole and the proceeds to be obtained from the disposition.[11]

A good faith purchaser is one who buys in good faith and for value.[12] A buyer in good faith is one who buys through a sale which does not involve fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders. For value means by at least 75 percent of the appraised value of the assets.[13] The trustee must provide evidence regarding the value of the asset to be sold in order for the court to judge the fairness of the sale.[14] The trustee's duty to creditors and the estate requires more than mere adoption of the appraisal advanced by the buyer.[15]

The trustee also bears the burden of proof regarding the prospective purchaser's good faith, and he cannot avoid the burden by failing to put on evidence.[16] The court cannot infer good faith from an evidentiary record silent on the question because such an inference would invert the burden of proof onto the objecting party.[17] The issue of the prospective purchaser's good faith is not always limited to situations involving fraud or collusive bidding. Failure to

---

[11] *Id.*

[12] *Tompkins v. Frey (In re Bel Air Assocs., Ltd.),* 706 F.2d 301, 304-05 (10th Cir. 1983).

[13] *Id.* at 305; 11 U.S.C.A. § 363.

[14] *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 149 (3d Cir. 1986).

[15] *In re Smith,* 349 B.R. 28, 37 (Bankr. D. Idaho 2005) (sale of closely-held family dealership did not pass fair and equitable test).

[16] *See, e.g., Whiting v. Gillman (In re Whiting)*, 325 B.R. 339 (Table), 2005 WL 1220494, at *5 (B.A.P. 10th Cir. 2005) (unpublished opinion) (when proposed purchaser's good faith is placed in issue, bankruptcy court must make findings of fact, and case will be remanded if court fails to do so); *see also In re Independent Gas & Oil Producers, Inc.*, 80 F. App'x 95, 2003 WL 22464027, at *5 (10th Cir. 2003) (unpublished) (remanding sale order for factual findings regarding purchaser's good faith even though issue raised for first time on appeal); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149-50 (3rd Cir. 1986) (requiring a finding of prospective purchaser's good faith by the bankruptcy court).

[17] *In re M Capital Corp.*, 290 B.R. 743, 747 (B.A.P. 9th Cir. 2003). The Ninth Circuit does not require a finding of good faith before authorizing a sale. The Tenth Circuit does. *In re Independent Gas & Oil Producers, Inc.*, 80 F. App'x 95, 2003 WL 22464027, at *5.

reveal material facts and failure to reveal ulterior motives which may affect the court's reasoning fails the good faith requirement as well.[18]

**B.    Motion to Abandon**

Where property is of inconsequential value to the estate, abandonment under § 554, rather than sale under § 363, is the proper course. On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon property of the estate that is burdensome or is of inconsequential value and benefit to the estate.[19] The party seeking abandonment bears the burden of proof.[20] The factual determination is within the court's discretion.[21] Abandonment is appropriate where there is no concrete evidence of value to the estate.[22] The party opposing abandonment must demonstrate the likely benefit to the estate of retaining the property.[23]

**C.    Analysis**

**1.    Sound Business Reason**

The Chapter 7 Trustee has not met his burden to prove this proposed sale is based on sound business judgment. The Trustee testified he is attempting to sell the stock because he believes he has a fiduciary responsibility to do so. However, he and other witnesses also

---

[18] *In re White Crane Trading, Co., Inc.,* 170 B.R. 694, 705 (Bankr. E.D. Cal. 1994) (purchaser lacked requisite good faith where parties failed to reveal the proposed sale would violate state consumer protection laws).
[19] 11 U.S.C. §554(b); *In re Alexander,* 289 B.R. 711 (B.A.P. 8th Cir. 2003).
[20] *In re Winsted Memorial Hosp.,* 249 B.R. 588, 595 (Bankr. D. Conn. 2000).
[21] *In re Nelson*, 251 B.R. 857, 859 (B.A.P. 8th Cir. 2000).
[22] *See, e.g., id.* at 861 (affirming the order compelling abandonment where trustee presents only a speculative scenario giving rise to value for the bankruptcy estate from two parcels of over-encumbered real property); *In re Thornton,* 269 B.R. 682, 685 (Bankr. W.D. Mo. 2001) (granting request for abandonment of property that would only result in recovery of $1,119.51 to apply toward debtor's unsecured debt of nearly $67,000.00).
[23] *Nelson*, 251 B.R. at 860.

testified the costs of bringing this sale are extremely high and are rising with each amended APA. The first APA was a failure and has been amended at least two times. At trial, Prime and the Trustee revealed a third amendment regarding taxes is forthcoming. Further, the SEC issues are complex and are not completely understood by the parties advancing the sale. The most problematic SEC issue is the experts' opinion the Trustee can not market the stock without violating SEC law. Both experts warn against publically seeking bidders for the stock, which is what trustees ordinarily do to obtain value for an estate asset. The SEC expert witnesses could not agree whether the stock could be sold to seven individuals or must be sold as a block to one purchaser. The SEC issues only serve to increase the sale costs going forward because both experts opined the winning bidder will have to provide BBI and FEI certain representations and a legal opinion regarding its compliance with SEC law. The risks of failing to close the sale are still high despite the amount of time and money which have already been spent to this point. The stock's value is not known. The stock is encumbered. The discretionary dividends only serve to cover the assets' associated income tax liabilities. The bid pays off the secured liens, but after sale costs, the return to unsecured creditors is inconsequential – less than one percent. The evidence shows a high cost sale with a *de minimis* return. This result does not support a finding of good business judgment.

        2.        **Fair Sale Price**

The Trustee did not offer evidence of a fair sale price. The stock has not been appraised. The Trustee and the SEC experts testified the sale could not be marketed or advertised for fear of violating SEC laws. The Trustee does not have any funds to make a public offering of the stock to obtain the best possible price. The Trustee testified he has not publicized the sale at all except

12.09.06 Buerge Sale or Abandon.wpd

for pleadings he filed and served on creditors. The Trustee testified Prime's offer is the best available price because it is the only offer, not because it is the result of extensive marketing or competitive bidding. The lack of effort to solicit other bids severely undermines the Trustee's conclusion regarding a fair sale price. The evidence shows Prime's bid is based on paying off the liens and leaving just enough to provide a pittance to distribute to unsecured creditors.[24] No evidence shows the bid is based on the value of the stock.

### 3. Good Faith Purchaser

Good faith and a fair sale price are necessarily intertwined because if the purchaser acts in good faith, then the sale procedure should produce fair value. Under the facts of this case, the proposed sale procedure will not generate fair value. Although structured as an auction, the sale is not designed to encourage competitive bidding because it will not be marketed. Also, prospective purchasers do not have access to information regarding the stock's value. Prime's bid is not based on the stock's actual value. Prime's bid is based on paying the secured debt in full and then providing an insignificant dividend to unsecured creditors. If the stock has enough value to administer, Prime should not have to increase its bid to cover accruing post-petition *per diem* interest. Prime should not have to escrow an additional $50,000 to cover the secured creditors' attorney fees.[25] An adequate equity cushion should cover these expenses. If there is not an adequate equity cushion, the Trustee should not administer this asset.[26]

---

[24] Exhibit 74. Elsewhere, Prime argues the shares may be worth in excess of $3 million in book value. Doc. No. 163 at 1.

[25] Secured creditors' fees have already exceeded $50,000 and may have to be paid from the estate - depleting the already negligible return.

[26] *See, e.g., Drake v. Franklin Equip. Co., et al. (In re Franklin Equip. Co.),* 416 B.R. 483, 530 (Bankr. E.D. Va. 2009).

- 10 -

12.09.06 Buerge Sale or Abandon.wpd

Case 11-20325    Doc# 204    Filed 09/06/12    Page 10 of 16

As for arm's length negotiations, the dealings between Prime and the Trustee are skewed to create a negligible benefit to unsecured creditors. At trial, the Trustee offered to reduce his statutory fee instead of requiring Prime to increase its bid to make sure an amount remains after the sale for distribution to unsecured creditors.[27] The statutory trustee fee is a cost of sale which should be supported by the value recovered after administering the asset. The insufficiency of the asset's value to cover the fee is more evidence the asset should not be administered.

Prime argues any recovery for unsecured creditors justifies the sale. However, the issue is good faith and whether the estate is receiving fair value. Prime suggests BBI and FEI may exercise their contractual option to purchase the stock before it is sold in the §363 sale. However, what might happen after the so-called auction is not germane to the good faith and fair value determination to approve the sale. BBI and FEI are not obligated to buy back the stock, and they rebuffed the Trustee's request they make an offer. The Court cannot approve a sale based on the hope BBI and FEI will exercise their options. The Court must have concrete evidence of value before it allows the Trustee to incur unnecessary sale costs and to expose the estate to potential risks.

The Trustee and the stalking horse bidder are too closely aligned. The Trustee's alliance with Prime appears to have contributed to his failure to seek or consider other options. While a stalking horse bidder often does substantive work at its own expense to further a sale motion, Prime exceeded the norm. Prime prosecuted the Trustee's motion while the Trustee was in some measure relegated to a witness called by Prime's counsel. Prime did not have its own

---

[27] Prime did not offer to forego its 85 percent recovery from the unsecured creditors' distribution.

12.09.06 Buerge Sale or Abandon.wpd

Case 11-20325    Doc# 204    Filed 09/06/12    Page 11 of 16

representative testify or even attend the hearing, which further belies Prime's good faith. Prime is funding the sale costs which would normally be administrative expenses of the estate; these include attorney fees, professional fees, and expert fees. Collectively, the evidence weighs against finding Prime is a good faith purchaser. Regardless of how active and assertive Prime is, it may not kidnap the process to the exclusion of other interests. This Court "must not blindly follow the hue and cry of the most vocal special interest groups . . . ."[28] This Court considers the "diverse interests of the debtor, creditors and equity holders, alike[,]" as well as "the proportionate value of the asset to the estate as a whole."[29]

### 4. Adequate and Reasonable Notice

The Trustee provided adequate and reasonable notice required by §363 and Fed. R. Bankr. P. 6004 and 2002; however, as noted above, the Trustee has not attempted to seek any other bidders or generate any interest in this proposed sale outside the creditors' matrix.

### 5. Abandonment

The evidence fails to show the stock's value is consequential to the estate. The stock constitutes a minority interest in a closely held family business. The stock's value, whatever it may be, is generally depreciating under losses caused by the Joplin tornado and historically low interest rates in place since the 2008 recession. The only numerical evidence of value is Debtor's Schedules B and D and the proposed purchase price; neither number was supported by an appraisal or other independent piece of corrobative evidence. The stock is encumbered by liens

---

[28] KELLY K. FRAZIER, ET AL., A COMPARISON SHOPPING GUIDE FOR 363 SALES 40 n.96 (Jonathan P. Friedland ed. 2009) (quoting *Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983).
[29] *Id.*

- 12 -

12.09.06 Buerge Sale or Abandon.wpd

Case 11-20325   Doc# 204   Filed 09/06/12   Page 12 of 16

with values hovering just below the offer price. According to the evidence, the cost to sell the stock includes expert opinion letters, a statutory trustee fee, and the secured lenders' accruing interest and attorney fees. The proposed sale to Prime would generate an insignificant dividend to unsecured creditors, which is estimated to be approximately $27,685 on $3 million of unsecured claims. A potential distribution of 0.9 percent (less than 1 percent) is of inconsequential value to the estate, especially since this low return appears to be the best case scenario for this asset. The Trustee and Prime enjoyed a large "bite of the apple" to carry the burden that this Court should approve the sale. Considering the lengthy logistical and procedural history of the case, followed by a three-day trial, the failure to carry this burden does not warrant a second bite at the apple. A second evidentiary hearing is not warranted. The balance of the scale tips to the abandonment of the stock and closure of this aspect of the Debtor's bankruptcy proceeding.

    D.    **Other Issues**

    1.    **Avoidance Actions**

Prime and the Trustee failed to demonstrate a possible avoidance action which could benefit the estate if the Trustee retained the stock. Prime and the Trustee argue against abandonment because a successful avoidance action against the secured lenders would create a $1.7 million return to unsecured creditors. Prime argued the Trustee should seek to avoid Liberty Bank's and Alden Buerge's liens by following *In re Garrison*.[30] *Garrison* found a shareholders' agreement, which prohibited shareholders from encumbering their stock without

---

[30] *Timberland Bancshares, Inc. v. Garrison (In re Garrison)*, 462 B.R. 666 (Bankr. W.D. Ark. 2011).

12.09.06 Buerge Sale or Abandon.wpd

written consent of all shareholders, prevented the creation of a security interest once the secured party had knowledge of the restriction. The BBI and FEI SPAs contain a similar restriction, and Prime alleges Debtor pledged the stock without complying with the SPAs. *Garrison* determined the Chapter 7 debtor-borrower relinquished his transfer rights by failing to abide by the shareholder agreement. Thus, the security interest did not attach, and the lender's lien could not be perfected.

A Chapter 7 trustee does not have standing to challenge attachment based on a breach of a shareholder agreement unless he is a beneficiary of the transfer restriction.[31] Transfer restrictions in shareholder agreements protect the company and the non-transferring shareholders, not the seller.[32] Further, the transfer restriction beneficiaries can waive compliance by acquiescence in a transfer of the particular stock, by failure to exercise the option within due time, or by prior dealings or a course of conduct on the part of the stockholder seeking to enforce the agreement directly inconsistent with a position subsequently taken.

*Garrison* will not work in this case because it was the *corporation*, not the Chapter 7 trustee, which successfully avoided the lien. Further, the corporation did not just avoid the lien. The corporation established the security interest never attached in the first place, which means the lien never existed to be subject to avoidance later. Attachment is the security interest coming into existence. Perfection renders a pre-existing security interest effective against third parties. Failure to perfect means a third party such as a hypothetical lien creditor can execute on the asset, but failure to perfect does not otherwise affect the security interest or the security

---

[31] *Craig v. Union County Bank (In re Crabtree),* 48 B.R. 528, 533 n.15 (Bankr. E.D. Tenn. 1985).
[32] *Blackwell v. Lurie (In re Popkin & Stern)*, 238 B.R. 146, 150 (B.A.P. 8th Cir. 1999).

agreement between the parties. In *Garrison,* the corporation sought a judgment declaring the lender's security interest in the stock null and void based on its own contract rights within the shareholders' agreement. The corporation prevailed in its declaratory judgment action. Oddly, after finding the lien never attached, *Garrison* then summarily held the trustee could avoid the nonexistent lien as unperfected under §544. However, there was no lien to avoid because the security interest never attached. Stepping into the shoes of the would-be lien holder, the trustee would have been holding unattached stock, not the avoided, unperfected lien. Thus, the stock certificates were more simply subject to turnover under §542 as an unencumbered asset of the estate.

In this case, Debtor's hypothetical judgment lien creditors can not challenge perfection based on Debtor's alleged breach of the SPAs' transfer restrictions and neither can the Trustee. The secured lenders, Liberty Bank and Alden Buerge, have control over Debtor's stock. The non-transferring BBI and FEI shareholders do not object to the pledge. Thus, the security interest is attached, perfected and not subject to avoidance by third parties such as the Trustee as a §544 creditor. There is no value to the estate as urged by Prime.

### 2. SEC Concerns

If the proposed sale could generate value for the estate, a § 363 order would require a finding the sale is in compliance with nonbankruptcy law. Such a finding would be subject to appeal, not collateral attack. The Trustee's and Prime's attempts to establish SEC compliance have proven costly and burdensome in relation to the expected return to the estate and expose the estate to additional risks, which support abandonment.

### 3. Standing

Prime questions Debtor's standing to challenge the Trustee's sale motion. Again, this issue is not germane to the decision because the Trustee did not meet his burden to prove a sound business reason, a fair sale price, or Prime is a good faith purchaser. Alden Buerge, BBI and FEI had standing to challenge the sale motion. Debtor bore the burden to show abandonment.

### 4. The $150,000 Offer

Yet another red herring in this case is the nebulous $150,000 offer to abandon the stock to Debtor. The offer was not officially presented to this Court, and no one offered any admissible evidence regarding it. Trustee specifically requested the Court to disregard it. The Trustee's request is granted.

### E. Conclusion

For the foregoing reasons, Debtor's Motion to Abandon is GRANTED, and the Trustee's Motion to Sell is DENIED.

IT IS SO ORDERED.

###

ROBERT D. BERGER
U.S. BANKRUPTCY JUDGE
DISTRICT OF KANSAS